IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| VISION ADVANCEMENT, LLC | § | |
| | § | |
| **Plaintiff** | § | |
| | § | **CIVIL ACTION NO. 2:05cv455** |
| vs. | § | |
| | § | |
| VISTAKON, A DIVISION OF | § | |
| JOHNSON & JOHNSON VISION | § | |
| CARE, INC. | § | |
| | § | |
| **Defendant** | § | |

## MEMORANDUM OPINION AND ORDER

The Court issues this claim construction opinion and order to construe terms that the parties contend are either in dispute or otherwise require construction.

The plaintiff, Vision Advancement, LLC ("Vision Advancement"), claims that defendant Vistakon ("Vistakon") infringes over ninety claims in the seven patents-in-suit, U.S. Patents No. 4,898,461 ("the '461 patent"), No. 5,657,108 ("the '108 patent"), No. 5,877,839 ("the '839 patent"), No. 6,186,625 ("the '625 patent"), No. 5,270,744 ("the '744 patent"), No. 6,527,389 ("the '389 patent"), No 5,166,711 ("the '711 patent"), and No. 6,409,340 ("the '340 patent").

The parties identified terms from those claims that they contend are either in dispute or that otherwise require construction. The parties filed claim construction briefs and the court held a *Markman* hearing. For the reasons set forth below, the Court construes the identified claims in accordance with the rulings made in this opinion.

### The Patents-In-Suit

The inventor of each of the patents-in-suit is Dr. Valdemar Portney ("Portney"). All of the patents-in-suit stem from the same original 1987 patent application, Ser. No. 56,050 (the "'050

Appln."). The '461 patent was filed as a continuation of the '050 Appln. and each of the other patents-in-suit depend from a divisional application of the application that resulted in the '461 patent. Accordingly, each of the patents-in-suit have essentially the same specification, including the same drawings. Therefore, just as the parties have done in their briefs, references to the specification for the '461 patent are used interchangeably for each of the other patents.

The patents-in-suit (collectively referred to as the "Portney Patents") relate to multifocal ophthalmic lenses (e.g., intra-ocular lenses, contact lenses, and corneal lenses). The lens is multifocal to correct for different distances. One example of a multifocal lens is the bifocal which corrects for near and distant vision. Vision correction is accomplished by different curvature of the lens. The '461 patent states that, "The present invention provides an improved multifocal ophthalmic lens by combining (a) a series of alternating power zones with (b) a continuously varying power within each zone, as well as in transition from one zone to another. In other words, a plurality of concentric zones (at least two) are provided in which the variation from far to near vision correction is continuous, i.e., from near correction focal power to far correction focal power, then back to near, and again back to far, or vice versa." '461 patent, at 2:35-44.

## Applicable Law

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Communications Group,*

*Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314-15.

Claims "must be read in view of the specification, of which they are a part." *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained

3

from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms. However, technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The patents-in-suit also contain "means-plus-function" limitations that require construction. Where a claim limitation is expressed in "means-plus-function" language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112, ¶ 6. *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, 35 U.S.C. § 112, ¶ 6

mandates that "such a claim limitation 'be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.'" *Id.* (citing 35 U.S.C. § 112, ¶ 6). Accordingly, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id.*

Construing a means-plus-function limitation involves multiple inquiries. "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once a court has determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* Moreover, the focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.*

### The Terms

<u>Terms with Agreed Constructions</u>

The Court adopts the parties' construction of several previously disputed terms. Those terms and their agreed constructions are:

*Ophthalmic Lens*: The phrase "ophthalmic lens" is to be given its plain and ordinary meaning, e.g., lens for the eye, intra-ocular lenses (IOLS), contact lenses, and corneal implant and only lenses.

5

*Concentric*: The term "concentric" is to be given its plain and ordinary meaning, e.g., having a common center or center point.

*Transition Regions*: The phrase "transition regions" is to be given its plain and ordinary meaning, e.g., segments of multifocal lens that change from a first vision correction power to a second vision correction power.

<u>Terms that Both Parties Assert Require Construction</u>

The Court will construe the following disputed terms which the parties agree require construction: (1) "Vision Correction Power/Vision Correction Value"; (2) "Progressive/Progressively"; (3) "Zones"; (4) "Annular"; (5) "Optical Axis"; (6) "means for providing in each of said first and second zones a first region having a first vision correction power and a second region having a second vision correction power which is significantly different from said first vision correction power, the vision correction power between the first and second optical powers being progressive"; and (7) "means for providing on one of said anterior or posterior faces, concentrically relative to said optical axis, a generally repetitive pattern comprising a number of radially outwardly alternating, annular regions or [sic] high and low vision correction powers, said regions of high and low vision correction powers being interconnected in an optical sense by transition regions, each of said transition regions having a range of progressive intermediate vision correction powers between the high and low vision correction powers."

The Court will also construe, as appropriate, the following terms which Vistakon asserts need construction, while Vision Advancement claims these terms do not need to be construed: (8) whether the preambles of certain claims should be construed as limitations; (9) "each cycle of such continuous variation from one value to the other and then back to the first"; (10) "correction power

6

being caused to vary"; (11) "continuously"; (12) "intermediate vision correction power"; "high vision correction power"; "low vision correction power"; "near vision correction power"; "far vision correction power"; and "predetermined vision correction power"; and (13) "said regions of high and low vision correction powers being interconnected in an optical sense by transition regions."

1.   *Vision Correction Power/Vision Correction Value*

The parties agree that the claims of the Portney Patents variously refer to the terms "vision correction power" or "vision correction value" synonymously. Those terms are found in Claims 1, 10(b), 14, 15, 19, 28, 29, 30, 32, 33, 34, 35, 36 and 41-44 of the '461 patent; Claims 1 and 8 of the '108 patent; Claims 1, 2, 3, 4, 5, 7, 10, 12, 13, 14, 17 and 18 of the '839 patent; Claims 1, 3, 4, 5, 7, 10, 13, 16 and 17 of the '625 patent; Claims 1, 2, 3, 5, and 8 of the '744 patent; Claims 1, 4, 7 and 14 of the '389 patent; 1, 4, 9 and 10 of the '711 patent; and Claims 1, 3, 5 and 10 of the '340 patent.

Vision Advancement argues that the common and ordinary meanings of "Vision Correction Power/Vision Correction Value" should prevail and cites to two medical dictionaries to propose a construction of "The measure of magnification required or used to neutralize a harmful or undesirable condition or to improve the condition of a person's eye sight." Vistakon advances the construction of "The dioptric power or value needed in a lens prescription to correct a refractive error; the dioptric power of the lens is measured with the lens off-eye."

At the *Markman* hearing, Vision Advancement agreed to the following alteration of Defendant's construction, "The dioptric power or value in a lens to correct refractive error." However, Vision Advancement maintains that Vistakon's construction further requiring that the lens be "measured with the lens off-eye" is too limiting because it is not needed to define the term. Vistakon claims that the Portney Patents' only reference to vision correction power is to the power

of a lens measured off-eye and that there is no mention in the patents of determining the power of the lens on-eye. Because, Vistakon argues, Portney never suggested to the examiner that the power of the lens–his or prior art lenses–should be determined on-eye, it stands to reason that the power of a lens should be measured off-eye. While it is true that the prosecution history can inform the meaning of claim language, *see Phillips*, 415 F.3d at 1317, the Court is not willing to import what was *not* mentioned in the patent or prosecution history. There is no statement that the power of the lens must be measured off-eye. Nor will the Court import that limitation into the claims because there is no statement that the lens can be measured on-eye. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003) (opining that for prosecution disclaimer to arise, the alleged "disavowing actions or statements made during prosecution [must] be both clear and unmistakable").

Therefore, the Court construes "Vision correction power/value" to mean the "The dioptric power or value in a lens to correct refractive error."

2.    *Progressive/Progressively*

The terms progressive/progressively are found in Claims 1, 10(b), 14(b), 19, 28, 29, 30, 32, 35, 36 and 44 of the '461 patent; Claims 1 and 8 of the '108 patent; Claims 3, 4, 5, 9, 10, 12, 14, 17 and 18 of the '839 patent; Claims 1, 3, 4, 5, 7, 10, 13, 16 and 17 of the '625 patent; Claims 1 and 8 of the '744 patent; Claims 1, 4, 7 and 14 of the '389 patent; Claims 1, 4, 9 and 10 of the '711 patent; and Claims 1, 3, 5 and 10 of the '340 patent.

Vision Advancement asserts that the term "progressive/progressively" should be construed as "continuous change or continuously changing," while Vistakon submits "A controlled, gradual gradient designed to provide a certain vision correction power, without any abrupt changes or edges or breaks or transitions."

Turning first to the claims, claim 1 of the '461 patent states that "the correction power being caused to vary continuously and progressively." '461 patent, 7:50-51.  Vision Advancement's definition would appear to make "progressively" superfluous because the claim language already requires that the power "vary continuously", which is the same as "continuously changing." See *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").  Therefore, the claim language supports a construction of "progressive" different than that urged by Vision Advancement.

The specification of the Portney Patents describes "progressive" when discussing the nature of the change in power in the lens of the invention.  As the specification states, "This change is continuous (progressive), without any abrupt correction changes, or "edges." '461 patent, 2:44-45; *see also* '461 patent Abstract.  Vision Advancement points to that language as showing that the '461 patent defines "progressive" as continuous.  However, that would require the Court to ignore the rest of that sentence.  Additionally, in the preceding sentence, the specification appears to define continuous when it states that the variation of the vision correction of the invention "is continuous, i.e., from near correction focal power to far correction focal power, then back to near, and again back to far, or vice versa." '461 patent, 2:40-44.  The term "progressive" appears in the next sentence along with the requirement that the change or variation also be "without any abrupt correction changes, or edges."

Furthermore, the only embodiment disclosed in the Portney Patents to demonstrate how vision correction power was adjusted by the curvature of the lens surface, depicted a lens surface that gradually transitioned between high and low vision correction powers, through intermediate vision

9

correction powers. *See* Col. 4:16-17; Col. 5:48-6:40. The fact that the Portney Patents disclose that "The undulating surface of the lens is preferably formed by a computer-controlled machining apparatus" underscores the gradual nature of the undulating surface. *See* Col. 5:48-6:40.

The statements and arguments made by the patentee to distinguish the prior art further support that the term "progressive" requires a gradual change or gradient of vision correction power without any abrupt correction changes or edges. In the Background section of the specification, the patentee distinguished U.S. Patent No. 4,162,122 ("Cohen") because the lens disclosed there had "disadvantages due to . . . abrupt curvature change of the lens surface from one zone to another." '261 patent, 2:3-13. Consistent with that statement, during prosecution of the '461 patent Portney distinguished the prior art Cohen and DeCarle bifocal lenses as lacking "any true progressive correction powers between the bifocal regions." Prosecution History, Def Br., Ex. P., VIST029127 (also noting "no suggestion that DeCarle's polishing is done to provide true progressive intermediate correction powers between the purely bifocal zones"). Portney further argued that his "progressive multifocal ophthalmic lens tends to reduce or eliminate this shadow image [of the prior art]" and "provides progressive intermediate imaging." *Id.*

Vistakon urges that the gradient of vision correction power should also be defined as "controlled" and that the vision correction power should be "certain". However, the Court finds no basis to add those terms to the definition of "progressive/progressively." Both of those terms appear to add ambiguity to the definition. For example, what does it mean to be "controlled" or "certain"? The specification of the '461 patent refers to the lens as preferably being formed by a "computer-controlled" apparatus, but it does not require it be so formed. '461 patent, 5:48-49. Therefore, the Court declines to add those terms to the definition of "progressive/progressively."

10

Accordingly, the Court construes the terms "progressive/progressively" to mean "A gradual gradient of vision correction power without any abrupt correction changes or edges."

3.   *Zone*

The term "zone" is found in Claims 1, 5, 10(a), 20, 21, 22, 23, 28, 29, 30, 31, 32, 35, 36, 37, 38 and 41-44 of the '461 patent; Claim 12 of the '744 patent; and Claims 9 and 10 of the '711 patent.

Vision Advancement contends that the term "zone" should be given its plain and ordinary meaning and proposes a construction of "One or more regions distinguished from adjacent parts by a distinctive feature or characteristic." Vistakon, on the other hand, proposes a construction of "A complete cycle, such as from the intermediate power through the high power, then back through the intermediate power to the low power, and finally back to the intermediate power."

Vision Advancement argues that Portney's various references to "zone" in the '961 patent show that he did not act as his own lexicographer and define the term narrowly as proposed by Vistakon. Vision Advancement first points to the repeated descriptions of the prior art as having zones, even though none of those prior art references disclose a "complete cycle" of powers as proposed by Vistakon. *See, e.g.*, Col. 1:25-33; 1:34-41; 2:3-7; 2:16-20. Vision Advancement also points to other uses of zone in the specification that do not refer to a complete cycle: (1) "the radial width of the zone for far-to-near transition is larger than the radial width of the zone for near-to-far transition", 2:45-50, and (2) "the small centrally placed "zone" of a constant curvature." 5:13-14. Finally, Vision Advancement argues that Vistakon's narrow definition of zone is inconsistent with the use of that term in the other claims, such as claim 19.

Vistakon argues that the inventor expressly defined zone in the specification as "a zone is considered to include a complete cycle, i.e., from the intermediate power through the high power,

11

then back through the intermediate power to the low power, and finally back to the intermediate power." *See* Col. 5:15-19. Vistakon contends that the reference to the centrally placed zone was merely Portney defining an exception to its definition of zone. Finally, Vistakon argues that its definition is "compatible" with the use of "zone" in claim 19.

The Court agrees with Vision Advancement that "zone" is not limited to a complete cycle. As noted by Vision Advancement, "zone" is used in the '461 patent to refer to various optical regions, many of which do not refer to a complete cycle. The Court turns first to the claims. In each of the claims in which "zone" appears, the claim itself defines what is required of the zone with respect to vision correction power or value. Claim 1 does require a complete cycle in a zone. Claim 1 states that "each cycle of such continuous variation from one value to the other and then back to the first being repeated in a plurality of zones." However, independent claims 10, 19, and 36 do not require such a cycle for a zone. For example, claim 19 refers to "each of said zones having a first region with near correction power, a second region with far vision correction power and an intermediate vision region between the first and second regions. . ." Claim 19 does not require that the zone include a full cycle of power, which for claim 19 would require the power return to the near vision correction power. The Court will not add the additional requirement that a zone must have a complete cycle of power variation when the claims expressly provide for what power variation is claimed (e.g., near to far in claim 19).

As pointed out by Vision Advancement, "zone" is used in the specification to refer to areas that have a complete cycle as well as areas that do not have a complete cycle. Vistakon relies primarily on the description at Col. 5:15-19 to argue that the patentee acted as his own lexicographer in defining "zone." The Court disagrees. The patentee's use of zone does not demonstrate that he

expressly defined "zone" as a complete cycle. As discussed above, the patentee used "zone" to refer to less than a complete cycle in many places in the specification and the claims. Additionally, the language relied on by Vistakon is a description of a preferred embodiment and is specifically in reference to Figure 4. 5:5-19. Without clear indicia that the patentee defined zone to include a complete cycle, the Court will not impose that description of a preferred embodiment onto the meaning of "zone." *See Tex. Instruments, Inc. v. Int'l Trade Comm'n*, 805 F.2d 1558, 1563 (Fed. Cir. 1986).

Vistakon further argues that there is no explanation in the patent of what a "distinctive feature or characteristic" would be as Vision Advancement proposes. The Court agrees that the Vision Advancement's construction of zone as "regions distinguished from adjacent parts by a distinctive feature or characteristic" is unnecessarily vague. As discussed above, "zone" refers to areas having certain optical characteristics such as variations in power. Thus, the Court construes "zone" as "One or more areas distinguished by optical characteristics."

4.    *Annular*

The term "annular" is found in Claims 5, 10(a), 14(b), 22, 32, 35, 38 and 44 of the '461 patent; Claims 1, 2, 8 and 9 of the '108 patent; Claims 4, 5, 9, 11, 14, 15 and 18 of the '839 patent; Claims 4, 5, 9, 13, 14 and 17 of the '625 patent; Claim 1 of the '744 patent; Claims 4, 9 and 15 of the '389 patent; 1, 2, 4, 9 and 10 of the '711 patent; and Claims 1, 3, 5, 10 and 11 of the '340 patent.

Vision Advancement argues that "annular" should be construed as "ring-shaped," while Vistakon argues for a construction of "forming a ring." Vision Advancement, in the alternative, agrees to the same dictionary definition that Vistakon relies on with an exception. Vision Advancement disagrees with Vistakon's construction to the extent that it does not include the

13

complete dictionary definition, *i.e.*, "of relating to, or forming a ring." Merriam-Webster's Medical Desk Dictionary Revised Edition at 41.

The Court agrees with the parties and finds that "annular" has not been given a special definition in the patent and, therefore, looks to the dictionary definition proffered by the parties to supply the necessary construction. *See Philips*, 415 F.3d at 1322 (finding dictionaries or comparable sources useful and appropriate when used to assist in understanding the commonly understood meaning of words). Thus, the Court construes "annular" to mean "of, relating to, or forming a ring."

5.    *Optical Axis*

The term "optical axis" is found in Claims 10(a), 14(a) and 14(b) of the '461 patent. Vision Advancement initially advanced a construction of the term "optical axis" as "A straight line perpendicular to the front of the lends and extending through the center of the pupil." Vistakon first proposed, "The straight line normal to both faces of a lens along whose path a ray will pass without being deflected."

At the *Markman* hearing, the parties agreed with the Court's proposed construction. Thus, the Court construes "optical axis" to be "A straight line perpendicular to the front of the lens and extending straight through the lens without being deflected."

6.    *Means for providing in each of said first and second zones a first region having a first vision correction powers and a second region having a second vision correction power which is significantly different from said first vision correction power, the vision correction power between the first and second optical powers being progressive.*

The parties agree that this limitation, found in Claim 10 of the '461 Patent, is in means-plus-function form. Similarly, both parties agree that the function is "providing in each of said first and second zones a first region having a first vision correction power and a second region having a

14

second vision correction power which is significantly different from said first vision correction power . . ." The only disagreement between the parties as to the function is Vistakon's inclusion of the phrase, "the vision correction power between the first and second optical powers being progressive."

The Court finds that the function proposed by Vistakon is exactly as recited in the claim language. *See* Col. 8:33-35 ( "the vision correction power between the first and second optical powers being progressive"). Because this language is directly from the claim language describing the function, the Court concludes that it should be included as part of the construed function. *See Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 249 F.3d 1314, 1324 (Fed. Cir. 2001), *vacated and remanded on other grounds*, 535 U.S. 1109 (2002).

The parties also substantially agree that the corresponding structures are the only two structures disclosed in the Portney Patents for carrying out the recited functions. Both parties agree to the following recitation, "Two structures are disclosed for providing variable vision correction power. The first structure is an undulating lens posterior surface that has a continuously changing curvature. . ." At this point, Vistakon proposes the inclusion of the phrase ". . . and which provides the recited vision correction powers." Similarly, the parties agree to the following recitation for the second structure: "The second structure is a lens having non-homogeneous surface characteristics having refractive material indices which continuously vary in the lens radial direction (out from the optical axis). . ." Again, Vistakon then proposes the inclusion of the phrase, ". . . and which provide the recited vision correction powers as required by the function."

Vision Advancement argues and Vistakon concedes that its proposed language is not found in the claim language or in the specification. However, Vistakon argues that the whole point of the

15

"means plus function" limitation and of the invention disclosed in the Portney Patents is that the undulating surface or the changing refractive indices of the surface of the lens provides the recited vision correction powers.  Def.'s Br. at 24.

The Court agrees with Vision Advancement that Vistakon's proposed additional language ("and which provide the recited vision correction powers required by the function") is nowhere found in the intrinsic record.  Further, the Court agrees with Vision Advancement that the additional proposed language is not part of the structure and, in fact, is encompassed within the function discussed above.

Accordingly, the Court construes the above means-plus-function element as:

> A means-plus-function limitation to be construed under 35 U.S.C. § 112, ¶ 6, wherein the function is providing in each of said first and second zones a first region having a first vision correction power and a second region having a second vision correction power which is significantly different from said first vision correction power, the vision correction power between the first and second optical powers being progressive.  Two structures are disclosed for providing variable vision correction power.  The first structure is an undulating lens posterior surface that has a continuously changing curvature.  The second structure is a lens having non-homogeneous surface characteristics having refractive material indices which continuously vary in the lens radial direction (out from the optical axis).  The term includes these structures and equivalents thereof.

7. *Means for providing on one of said anterior or posterior faces, concentrically relative to said optical axis, a generally repetitive pattern comprising a number of radially outwardly alternating, annular regions or [sic] high and low vision correction powers, said regions of high and low vision correction powers being interconnected in an optical sense by transition regions, each of said transition regions having a range of progressive intermediate vision correction powers between the high and low vision correction powers.*

Again, the parties agree that this limitation, found in Claim 14 of the '461 Patent, is in means-plus-function form.  Similarly, both parties agree that the function is "providing on one of the anterior or posterior faces, concentrically relative to the optical axis, a generally repetitive pattern

comprising a number of radially outwardly alternating, annular regions of high and low vision correction powers. . ." The only disagreement between the parties as to the function is Vistakon's inclusion of the phrase, "said regions of high and low vision correction power being interconnected in an optical sense by transition regions, each of said transition regions having a range of progressive intermediate vision correction powers between the high and low vision correction powers."

The Court finds that the function as proposed by Vistakon is exactly as recited in the claim language. *See* Col. 8:56-61 ("said regions of high and low vision correction power being interconnected in an optical sense by transition regions, each of said transition regions having a range of progressive intermediate vision correction powers between the high and low vision correction powers"). Because this language is directly from the claim language describing the function, the Court concludes that it should be included as part of the function. *See Lockheed Martin*, 249 F.3d at 1324.

The parties also substantially agree, as discussed above, that the corresponding structures are the only two structures disclosed in the Portney Patents for carrying out the recited functions. As before, both parties agree to the following recitation, "Two structures are disclosed for carrying out this function. The first structure is an undulating lens posterior surface that has a continuously changing curvature. . ." At this point, Vistakon again proposes the inclusion of the phrase ". . . and which provides the recited vision correction powers." Similarly, the parties agree to the following recitation for the second structure: "The second structure is a lens having non-homogeneous surface characteristics having refractive material indices which continuously vary in the lens radial direction (out from the optical axis). . ." Again, Vistakon then proposes the inclusion of the phrase, ". . . and which provide the recited vision correction powers as required by the function."

17

As with the other means-plus-function element, Vision Advancement argues and Vistakon concedes that its proposed language is not found in the claim language or in the specification. However, Vistakon argues that the whole point of the "means-plus-function" clause and of the invention disclosed in the Portney Patents is that the undulating surface or the changing refractive indices of the surface of the lens provides the recited vision correction powers. Def.'s Br. at 24.

As previously discussed, the Court agrees with Vision Advancement that Vistakon's proposed additional language ("and which provide the recited vision correction powers required by the function") is nowhere found in the intrinsic record. Further, the Court agrees with Vision Advancement that the additional proposed language is not part of the structure and, in fact, is encompassed within the function discussed above.

Accordingly, the Court construes this means-plus-function element as:

A means-plus-function limitation to be construed under 35 U.S.C. § 112, ¶ 6, wherein the function is providing on one of the anterior or posterior faces, concentrically relative to the optical axis, a generally repetitive pattern comprising a number of radially outwardly alternating, annular regions of high and low vision correction powers, said regions of high and low vision correction power being interconnected in an optical sense by transition regions, each of said transition regions having a range of progressive intermediate vision correction powers between the high and low vision correction powers. Two structures are disclosed for providing variable vision correction power. The first structure is an undulating lens posterior surface that has a continuously changing curvature. The second structure is a lens having non-homogeneous surface characteristics having refractive material indices which continuously vary in the lens radial direction (out from the optical axis). The term includes these structures and equivalents thereof.

Terms that Vistakon Asserts Require Construction

8.    *Preambles*

An additional claim construction issue is whether the preamble of the independent claims asserted by Vision Advancement are limitations on the scope of the claims. Vistakon argues that the

preambles of the following claims should be construed as limitations:  claims 1, 10, 14, 19, 35, 36 and 44 of the '461 Patent; claims 1 and 8 of the '108 Patent; claims 1, 4, 7, 14 and 18 of the '839 Patent; claims 13 and 17 of the '625 Patent; claim 1 of the '744 Patent; claims 7 and 14 of the '389 Patent; claims 1, 4 and 9 of the '711 Patent; and claims 5 and 10 of the '340 Patent.

If a preamble "recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim, then it is a limitation." *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1309 (Fed. Cir. 2004) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)).  On the other hand, "[i]t is well settled that if the body of the claim sets out the complete invention, and the preamble is not necessary to give life, meaning and vitality to the claim, then the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation." *Altiris Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371 (Fed. Cir. 2003), (quoting *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1310, 64 USPQ2d 1832, 1837 (Fed. Cir. 2002)).

The Court agrees with Vistakon that the preamble is a limitation in each of the apparatus or structural claims identified by Vistakon, i.e., '461 patent, claims 1, 10, 14 19, 32, 35, 36 and 44; '108 patent, claims 1 and 8; '839 patent, claims 7, 14 and 18; '625 patent, claims 7, 13 and 17; '340 patent, claims 5 and 10; '744 patent, claims 1 and 12; '389 patent, claims 7 and 14; and '711 patent, claims 1, 4 and 9.  In each of those claims, the Court finds that the preamble recites structure necessary to give meaning to the claims.  In each of these claims, the body of the claim specifically refers to elements or structures contained in the preamble, e.g., '461 patent, claim 1 - "the correction power," and '108 patent, claim 1 - "said lens."  Therefore, the preamble necessarily gives meaning to the rest of the claim.

19

The Court does not agree that the preambles of claims 1 and 4 are limitations of those claims. Each of those claims are method claims. Those preambles indicate the purpose (vision correction) of the claimed methods, but they do not add meaning to the claimed methods. For example, even if the preamble merely recited "a method," the body of the claim has the same meaning. Therefore, the Court does not construe the preambles in those claims to be limitations.

9.    *Each cycle of such continuous variation from one value to the other and then back to the first*

The above phrase is found in Claim 1 of the '461 patent. Vision Advancement argues that the phrase does not require construction because its plain meaning is understood by one of ordinary skill in the art.

Vistakon argues that although the plain language of this phrase does not indicate that the first correction value and that the second correction value must each be the same in each zone, the examiner allowed this claim "with the understanding that the first correction values should be the same and the second correction values should be the same." Vistakon contends that the examiner rejected a claim that included the language: "all of said regions of high optical powers not necessarily having a uniform width *or a uniform high optical power*, and all of said regions of low optical powers not necessarily having a uniform width *or a uniform low optical power*," as "new matter" because "nowhere is it disclosed that these high and low powers can be anything different" and only issued the amended claim as Claim 17 in the '461 Patent after Portney amended it to remove the objectionable language. According to Vistakon, the Examiner issued claim 17 of the '461 patent only after the objectionable language was removed and with the understanding that the "high" and "low" optical powers in the different regions of the Portney lens were the same.

20

The Court disagrees with Vistakon's reliance on the prosecution history. As an initial matter, the Court declines to speculate on the Examiner's "understanding" beyond what is stated in the record. Vistakon's argument relies on the meaning of the statement that "[n]owhere is it disclosed that these high and low powers can be anything different." Does that mean, as Vistakon urges, that the powers must be the same in each zone? The Court finds that the Examiner's comments are unclear as to what "anything different" refers. The preceding sentencing in the prosecution history refers to various features related to the high and low powers in each zone, e.g., a transition from high to low and the "high and low powers [are] defined as those powers to correct for near vision and distant vision." "Anything different" might refer to the relationship of the powers, just as described, rather than the powers being the same. Additionally, the argument raised by Vistakon relates to claim 17, not claim 1 where the language at issue appears. Therefore, this does not amount to an express or unequivocal disclaimer as Vistakon suggests. *Middleton, Inc. v. Minn. Mining & Mgf. Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002).

Vistakon acknowledges that the plain language of this phrase does not indicate that the correction values must be the same in each zone. Because the Court concludes that the prosecution history does not change the plain meaning of that phrase, the Court finds that no construction is necessary.

10.   *Correction power being caused to vary*

This phrase is found in Claim 1 of the '461 patent. Vistakon urges a construction of, "the dioptric power varies due to the design of the surface of the lens." Vision Advancement contends that "vision correction power" has already been construed and that this phrase does not require any further construction. Further, Vision Advancement argues that the term should not be limited to the

21

"design"of the lens, nor should it reference the physical structure of the "surface" of the lens, as correction power is an optical property. The Court finds nothing in that phrase or the specification cited by Vistakon that would require inserting the "design of the surface of the lens" into that phrase. Accordingly, the Court declines to construe this phrase.

11.   *Continuously*

Again, Vision Advancement argues that this term, found in Claim 1 of the '461 patent, should be given its plain and ordinary meeting and does not require construction. Vistakon proposes a construction of, "The lens surface has no discontinuities in progressivity." Vistakon supports its argument by pointing to the prosecution history and the examiner's disallowance of claim language allowing correction power to change "*substantially* continuously." The Court disagrees with Vistakon. The Examiner rejected the use of "substantially" because of the "inherent vagueness" of that word. Vistakon's Br., Ex. R at VIST029104. That does not provide an explicit basis to graft onto the term a requirement of "no discontinuities in progressivity." Without such a clear showing, the Court finds no need to construe this term.

12.   *Intermediate vision correction power; High vision correction power; Low vision correction power; Near vision correction power; Far vision correction power;* and *Predetermined vision correction power*

Vistakon seeks a construction of the above terms, found in Claims 1, 14 and 19 of the '461 patent, and Claim 1 of the '711 patent. However, the Court has already construed the terms "vision correction power" and "progressive" and finds that these terms sufficiently convey to the jury all that is necessary to understand these additional terms. The Court sees no need to construe the terms further to add terms of relativity or specific distance. Thus, the Court concludes no further construction is necessary.

22

13.    *Said regions of high and low vision correction powers being interconnected in an optical sense by transition regions*

The final phrase Vistakon seeks construction of is "said regions of high and low vision correction powers being interconnected in an optical sense by transition regions" from claim 14 of the '461 patent. Vision Advancement once again contends that "vision correction power" has already been construed, and the parties have agreed on the proper construction for "transition regions." Therefore, according to Vision Advancement, this phrase does not require any further construction. Vistakon, on the other hand, posits that the term should be construed as, "the regions of high and low vision correction powers are connected by a transition region in a fashion to provide usable vision correction." In essence, Vistakon seeks construction of the portion of the phrase that states "interconnected in an optical sense." Vision Advancement does not contend that phrase has already been construed.

The Court agrees with Vistakon that the phrase "interconnected in an optical sense" requires construction. While the Court agrees that Vistakon's proposed construction, for the most part, is appropriate for "interconnected in an optical sense," and supported by the portions of the '461 patent cited by Vistakon, the Court finds the word "useable" to be vague. Therefore, the Court construes the term "said regions of high and low vision correction powers being interconnected in an optical sense by transition regions" to mean "the regions of high and low vision correction powers are connected by a transition region in a fashion to provide vision correction."

### Conclusion

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above. For ease of reference, the Court's claim interpretations are set forth in a table

attached to this opinion.

**So ORDERED and SIGNED this 26th day of January, 2007.**

_____
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

# JOINT CLAIM CONSTRUCTION CHART

## DISPUTED TERMS

| CLAIM TERM | PLAINTIFF'S PROPOSED CONSTRUCTION | DEFENDANT'S PROPOSED CONSTRUCTION | COURT'S CONSTRUCTION |
|---|---|---|---|
| Vision Correction Power/ Vision Correction Value | The measure of magnification required or used to neutralize a harmful or undesirable condition or to improve the condition of a person's eye sight. | The dioptric power or value needed in a lens prescription to correct a refractive error; the dioptric power of the lens is measured with the lens off-eye. | The dioptric power or value in a lens to correct refractive error. |
| Progressive/Progressively | Continuous change or continuously changing. | A controlled, gradual gradient designed to provide a certain vision correction power, without any abrupt changes or edges or breaks or transitions. | A gradual gradient of vision correction power without any abrupt correction changes or edges. |
| Zones | One or more regions distinguished from adjacent parts by a distinctive feature or characteristic. | A complete cycle, such as from the intermediate power through the high power, then back through the intermediate power to the low power, and finally back to the intermediate power. | One or more areas distinguished by optical characteristics. |
| Annular | Ring-shaped | Forming a ring. | Of, relating to, or forming a ring. |
| Optical Axis | A straight line perpendicular to the front of the lens and extending through the center of the pupil. | The straight line normal to both faces of a lens along whose path a ray will pass without being deflected. | A straight line perpendicular to the front of the lens and extending straight through the lens without being deflected. |

| "means for providing in each of said first and second zones a first region having a first vision correction power and a second region having a second vision correction power which is significantly different from said first vision correction power, the vision correction power between the first and second optical powers being progressive" | A means-plus-function limitation to be construed under 35 U.S.C. § 112, ¶ 6, wherein the function is providing in each of said first and second zones a first region having a first vision correction power and a second region having a second vision correction power which is significantly different from said first vision correction power, the vision correction power between the first and second optical powers being progressive. Two structures are disclosed for providing variable vision correction power. The first structure is an undulating lens posterior surface that has a continuously changing curvature. The second structure is a lens having non-homogeneous surface characteristics having refractive material indices which continuously vary in the lens radial direction (out from the optical axis). The term includes these structures and equivalents thereof. | A means-plus-function limitation to be construed under 35 U.S.C. § 112, ¶ 6, wherein the function is providing in each of said first and second zones a first region having a first vision correction power and a second region having a second vision correction power which is significantly different from said first vision correction power, the vision correction power between the first and second optical powers being progressive. Two structures are disclosed for providing variable vision correction power. The first structure is an undulating lens posterior surface that has a continuously changing curvature and which provides the recited vision correction powers. The second structure is a lens having non-homogeneous surface characteristics having refractive material indices which continuously vary in the lens radial direction (out from the optical axis) and which provide the recited vision correction powers as required by the function. | A means-plus-function limitation to be construed under 35 U.S.C. § 112, ¶ 6, wherein the function is providing in each of said first and second zones a first region having a first vision correction power and a second region having a second vision correction power which is significantly different from said first vision correction power, the vision correction power between the first and second optical powers being progressive. Two structures are disclosed for providing variable vision correction power. The first structure is an undulating lens posterior surface that has a continuously changing curvature. The second structure is a lens having non-homogeneous surface characteristics having refractive material indices which continuously vary in the lens radial direction (out from the optical axis). The term includes these structures and equivalents thereof. |

| | | |
|---|---|---|
| "means for providing on one of said concentrically relative to said optical axis, a generally repetitive pattern comprising a number of radially outwardly alternating, annular regions or [sic] high and low vision correction powers, said regions of high and low vision correction being interconnected in an optical sense by transition regions, each of said transition regions having a range of progressive intermediate vision correction powers between the high and low vision correction powers" | A means-plus-function limitation to be construed under 35 U.S.C. § 112, ¶ 6, wherein the function of this claim is providing on one of said anterior or posterior faces, concentrically relative to said optical axis, a generally repetitive pattern comprising a number of radially outwardly alternating, annular regions of high and low vision correction powers. Two structures are disclosed for providing variable vision correction power. The first structure is an undulating lens posterior surface that has a continuously changing curvature. The second structure is a lens having non-homogeneous surface characteristics having refractive material indices which continuously vary in the lens radial direction (out from the optical axis). The term includes these structures and equivalents thereof. | A means-plus-function limitation to be construed under 35 U.S.C. § 112, ¶ 6, wherein the function is providing on one of the anterior or posterior faces, concentrically relative to the optical axis, a generally repetitive pattern comprising a number of radially outwardly alternating, annular regions of high and low vision correction powers, said regions of high and low vision correction power being interconnected in an optical sense by transition regions, each of said transition regions having a range of progressive intermediate vision correction powers between the high and low vision correction powers. The second structure is a lens having non-homogeneous surface characteristics having refractive material indices which continuously vary in the lens radial direction (out from the optical axis) and which provide the recited vision correction powers as required by the function. | A means-plus-function limitation to be construed under 35 U.S.C. § 112, ¶ 6, wherein the function is providing on one of the anterior or posterior faces, concentrically relative to the optical axis, a generally repetitive pattern comprising a number of radially outwardly alternating, annular regions of high and low vision correction powers, said regions of high and low vision correction power being interconnected in an optical sense by transition regions, each of said transition regions having a range of progressive intermediate vision correction powers between the high and low vision correction powers. The second structure is a lens having non-homogeneous surface characteristics having refractive material indices which continuously vary in the lens radial direction (out from the optical axis). The term includes these structures and equivalents thereof. |

| | | | |
|---|---|---|---|
| Each cycle of such continuous variation from one value to the other and then back to the first | This is a lengthy phrase does not require construction. | Due to prosecution history estoppel, the first correction value must be the same in each zone; the second correction value must be the same in each zone. | Plain and ordinary meaning |
| Correction power being caused to vary | Vision Correction Power has already been construed. This phrase does not require any further construction. | The dioptric power varies due to the design of the surface of the lens. | Plain and ordinary meaning |
| Continuously | This term should be given its plain and ordinary meaning and does not require construction. | The lens surface has no discontinuities in progressivity. | Plain and ordinary meaning |
| Intermediate vision correction power | Vision Correction Power has already been construed. This phrase does not require any further construction. | The numerical measure of dioptric power(s) between the first and second powers needed to correct for intermediate vision. | Plain and ordinary meaning |
| Said regions of high and low vision correction powers being interconnected in an optical sense by transition regions. | Vision Correction Power has already been construed, and the parties have agreed on the proper construction for transition regions. This phrase does not require any further construction. | The regions of high and low vision correction powers are connected by a transition region in a fashion to provide usable vision correction. | The regions of high and low vision correction powers are connected by a transition region in a fashion to provide vision correction. |
| High vision correction power | Vision Correction Power has already been construed. This phrase does not require any further construction. | In a lens prescription, the dioptric power to view an object at a near distance; the add power is specified as positive although the total near power may be positive or negative. | Plain and ordinary meaning |
| Low vision correction power | Vision Correction Power has already been construed. This phrase does not require any further construction. | In a lens prescription, the dioptric power to view an object at a far distance also known as distance perception, and may be positive or negative. | Plain and ordinary meaning |

| CLAIM TERM | | | COURT'S CONSTRUCTION |
|---|---|---|---|
| Near vision correction power | Vision Correction Power has already been construed. This phrase does not require any further construction. | The dioptric power to rectify refractive error at typical reading distance, commonly taken at 13 - 16 inches. | Plain and ordinary meaning |
| Far vision correction power | Vision Correction Power has already been construed. This phrase does not require any further construction. | The dioptric power to rectify refractive error at typical viewing distance, commonly taken at 20 feet or greater. | Plain and ordinary meaning |
| Predetermined vision correction power | Vision Correction Power has already been construed. This phrase does not require any further construction. | In a lens prescription, an area of constant curvature having a single dioptric power determined beforehand. | Plain and ordinary meaning |

## AGREED TERMS

| CLAIM TERM | AGREED CONSTRUCTION | COURT'S CONSTRUCTION |
|---|---|---|
| Ophthalmic Lens | The phrase "ophthalmic lens" is to be given its plain and ordinary meaning, e.g., lens for the eye, intra-ocular lenses (IOLs), contact lenses, and corneal implant and onlay lenses. | The phrase "ophthalmic lens" is to be given its plain and ordinary meaning, e.g., lens for the eye, intra-ocular lenses (IOLs), contact lenses, and corneal implant and onlay lenses. |
| Concentric | The term "concentric" is to be given its plain and ordinary meaning, e.g., having a common center or center point. | The term "concentric" is to be given its plain and ordinary meaning, e.g., having a common center or center point. |
| Transition Regions | The phrase "transition regions" is to be given its plain and ordinary meaning, e.g., segments of multifocal lens that change from a first vision correction power to a second vision correction power. | The phrase "transition regions" is to be given its plain and ordinary meaning, e.g., segments of multifocal lens that change from a first vision correction power to a second vision correction power. |